## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| CLAUDETTE JORDAN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:22-cv-00268-SLC** |
| | ) | |
| M & T BANK CORPORATION, | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>OPINION AND ORDER</u>

Plaintiff Claudette Jordan filed this case against Defendant M & T Bank Corporation (the "Bank") on August 12, 2022, alleging that the Bank violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, after Jordan co-signed an automobile loan for her boyfriend's son. (ECF 1). Now before the Court are the parties' cross-motions for summary judgment (ECF 42, 48), together with supporting briefs, statement of material facts, and supporting evidence (ECF 43-44, 49-50, 52-54, 56). The Bank seeks summary judgment in its favor on all of Jordan's claims. (ECF 42). Jordan seeks partial summary judgment, asking that the Court find the Bank liable on all her claims but that the case proceed to trial on damages. (ECF 48). The motions are now fully-briefed and ripe for ruling. (ECF 62-64, 71-72).[1]

For the following reasons, the Bank's motion for summary judgment will be GRANTED, and Jordan's summary judgment motion will be DENIED.

## I. PROCEDURAL BACKGROUND

In her operative complaint filed on May 2, 2023, Jordan alleges that the Bank willfully, or in the alternative, negligently, violated the FCRA by: (1) reporting inaccurate information to

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (ECF 17 at 3; ECF 20).

the credit reporting agencies ("CRAs")[2] in stating that she was responsible for account no. 2001; (2) failing to report back to the CRAs that account no. 2001 was "disputed"; (3) failing to conduct a reasonable investigation into the disputed information; and (4) illegally accessing and using her credit report without a permissible purpose. (ECF 28 ¶¶ 55-56, 58-59; *see* ECF 52 ¶ 23). Jordan seeks to recover actual damages for out-of-pocket expenses, emotional distress, and detriment to her credit rating; statutory damages in the amount of $2,000 for each and every violation of the FCRA; punitive damages; and costs and attorney fees. (*Id.* at ¶¶ 57, 60, and p. 9).

The Court conducted a preliminary pretrial conference on November 30, 2022, setting a fact and expert discovery deadline of June 12, 2023, and a dispositive motions deadline of July 12, 2023. (ECF 18, 19). These deadlines were later extended to January 29, 2024, for fact discovery; April 13, 2024, for expert discovery; and June 13, 2024, for dispositive motions. (ECF 30, 33, 35, 40).

On March 13, 2024, the Bank filed its summary judgment motion, seeking judgment as a matter of law in its favor on all of Jordan's claims. (ECF 42). That same day, the Bank filed a motion to stay its expert witness disclosure deadline and further expert discovery until the Court rules on the summary judgment motion. (ECF 41). The Court granted the motion to stay after Jordan failed to oppose it. (ECF 45). On April 17, 2024, Jordan filed a cross-motion for partial summary judgment, seeking judgment as a matter of law in her favor as to the Bank's liability but that the case proceed to trial on damages. (ECF 48).

---

[2] A "credit reporting agency" may also be referred to as a "consumer reporting agency" or a "credit bureau." *See Consumer Data Indus. Ass'n v. Swanson*, No. 07-CV-3376 (PJS/JJG), 2007 WL 2219389, at *1 (D. Minn. July 30, 2007) ("Credit bureaus (also known as 'credit reporting agencies' and 'consumer reporting agencies') such as Equifax, Experian, and TransUnion collect information about consumers' credit experience and resell that information for various purposes."). The abbreviation "CRA" as used herein shall refer to any of these terms.

## II. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* (collecting cases). The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* (citations omitted). However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

"When, as here, cross-motions for summary judgment are filed, we look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)); *see also M.O. v. Ind. Dep't of Educ.*, 635 F. Supp. 2d 847, 850 (N.D. Ind. 2009). The assertion by one party "that there are no issues of material fact sufficient to prevent the entry of judgment in its favor does not bar that party from asserting that there are

issues of material fact sufficient to prevent the entry of judgment as a matter of law against it." *M.O.*, 635 F. Supp. 2d at 850 (citation omitted); *see Zook v. Brown*, 748 F.2d 1161, 1166 (7th Cir. 1984). That is, cross-motions for summary judgment do not alter each party's burdens in the summary judgment analysis; each responsive party must establish a triable issue of fact to defeat the moving party's cross-motion for summary judgment. *See McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008), *abrogated on other grounds by Henson v. Santander Consumer USA, Inc.*, 582 U.S. 79 (2017); *see also M.O.*, 635 F. Supp. 2d at 850. The cross-motions "are treated separately." *McKinney*, 548 F.3d at 504 n.4 (citation omitted).

### III. STATEMENT OF MATERIAL FACTS

Jordan is a resident of Fort Wayne, Indiana, and has worked as a paralegal or court scheduler in the litigation department of law firms since 2008. (ECF 52 ¶ 1).[3] The Bank is a bank licensed to do business in Indiana and regularly conducts business in Indiana. (*Id.* ¶ 2).

#### A. Jordan Cosigns the Auto Loan

On March 3, 2017, Jordan cosigned as a borrower with her boyfriend's son, Kade Kinnaley, for a 2011 Dodge Charger (the "vehicle") in the amount of $43,879.08. (*Id.* ¶¶ 4, 5).[4] The Bank provided the financing for the purchase agreement to the loan, and both Jordan and Kinnaley signed the Motor Vehicle Installment Loan Note and Security Agreement (the "Auto Loan"). (ECF 52 ¶ 5; *see* ECF 44-2 at 7-13). The Bank took a security interest in the vehicle to ensure performance under the Auto Loan. (ECF 52 ¶ 5; ECF 44-2 at 7-13). The Auto Loan was assigned account number ******0001 ("account no. 0001"). (ECF 52 ¶ 5; ECF 44-2 at 14). The

---

[3] Jordan's work experience also includes a short time in the collections department of a law firm that managed accounts for post-repossession automobile debts. (*Id.*)

[4] At the time, Kinnaley could not qualify for a loan on his own. (ECF 64 ¶ 113).

Auto Loan provided that the Bank could "exercise any right against any person or property without losing any right against me" and further, that:

> [The Bank] can do any of the following without notifying me or losing any right against me in the future: (a) give additional time for the payment of any amount payable under [the Auto Loan] regardless of the number of times [the Bank] previously did so and regardless of the length of any additional time [the Bank] previously gave.

(ECF 44-2 at 8; *see* ECF 52 ¶ 5).[5] Jordan and Kinnaley were jointly responsible for the full payment of the Auto Loan until it was paid in full. (ECF 52 ¶ 6). The vehicle was used by Kinnaley alone, so Jordan relied on Kinnaley to make the payments. (ECF 64 ¶ 114). Yet, Jordan knew she was responsible for the full payment of the Auto Loan if need be. (ECF 52 ¶ 7).

In February 2018, Kinnaley registered the vehicle with the Department of Motor Vehicles to his address at 525 Main, Payne, Ohio. (*Id.* ¶ 8). While Jordan knew Kinnaley was registering the vehicle to an address in Ohio, she testified that she did not know Kinnaley was registering it to that specific address. (*Id.*).

On May 16, 2018, Jordan requested the account information from Kinnaley in order to make a payment. (*Id.* ¶ 9). Kinnaley sent Jordan a screen-shot of the account information that included the account number and the Payne, Ohio, address. (*Id.*). Jordan, however, contends she had no knowledge that Kinnaley's address was the address associated with the Auto Loan. (*Id.*). When signing the Auto Loan with the Bank, Jordan's address was 3405 Vance Avenue, Fort Wayne, Indiana 46805, and her address did not later change. (*Id.*).

In May 2018, Jordan made a payment on the Auto Loan because Kinnaley was unable to. (*Id.* ¶ 10). This is the only payment Jordan ever made on the Auto Loan. (*Id.*).

---

[5] The term "me" was defined in the Auto Loan as "each and all the borrowers who signed [the Auto Loan], individually and together." (ECF 52 at 4; ECF 44-2 at 7).

*B. The Auto Loan Falls Into Default, and the Bank Repossesses the Vehicle*

The Auto Loan fell into default, and the Bank repossessed the vehicle in November 2018.
(*Id.* ¶ 11). Kinnaley did not tell Jordan about the repossession at the time because he "felt like a
trash human for . . . getting the car repossessed . . . . [and] didn't know how to confront the
situation." (ECF 52-15 at 25; *see also id.* at 39; ECF 64 ¶ 116).[6] The vehicle was sold at a public
auction on December 15, 2018. (ECF 52 ¶ 11). After the sales proceeds of $13,227 were applied
to the Auto Loan, an outstanding deficiency of $15,710.28, plus fees, remained, for a total
deficiency balance of $16,630. (*Id.*).

Jordan never received written notice from the Bank of any missed payments on the Auto
Loan. (ECF 64 ¶ 115). She did admit that the Bank called her at least in March 2018 when there
was a missed payment. (*Id.*; *see* ECF 44-1 at 59-60). Jordan claims that she would have taken
responsibility for the missed payments if the Bank had notified her, yet she further testified that
when the Bank did call her about a delinquent payment, she merely contacted Kinnaley to relay
the information. (ECF 64 ¶ 115; *see also* ECF 44-1 at 83-84; ECF 44-12 at 6-8).

*C. Kinnaley Agrees to Participate in the Bank's DBP*

When a customer still owes money after the repossession or total loss of collateral and is
unable to pay the deficiency balance in full, the Bank gives the customer an opportunity to
participate in its Deficiency Balance Program ("DBP"). (ECF 52 ¶ 12; *see* ECF 49-1). The
claimed benefits to the DBP program include reduced monthly payments for the customer; "an
easier way to fulfill [the customer's] contractual obligation to [the Bank]"; the repossession
showing as "REPO" and "PAID" on a customer's credit report; and that it "[a]voids a charge off

---

[6] As will be discussed *infra*, it was not until June 2019 that Kinnaley told Jordan the vehicle had been repossessed. (ECF 64 ¶¶ 116-17; *see also* ECF 44-1 at 110-11; ECF 44-12 ¶¶ 9-10).

reporting and the establishment of a new loan on a credit bureau." (ECF 49-1 at 1-2).

To start the DBP process, the Bank issues the customer a "LWOMAR" letter within one month of the sale of the collateral. (*Id.* at 1). If the customer wishes to participate in the DBP, the customer must make two consecutive payments at the new repayment amount in "good faith" to begin the DBP. (*Id.*)."Although the returned letter with the customer's signature is preferred, the official customer authorization to take part of the DBP is their verbal agreement and the receipt of the Good Faith payments." (*Id.* at 3). The "[t]erm of rewrite is limited to the term of the original loan." (*Id.* at 1). Once a customer is authorized to participate in the DBP, the Bank will "[c]omplete the DBP confirmation letter with the new proposed account information" and "[f]ollow up on the rewrite to ensure all proper fees have been waived, [the] loan is closed out[,] and [a] new account number" is assigned. (*Id.* at 3-4).

In February 2019, Kinnaley and Beth MacPherson, a collections representative for the Bank, discussed the Auto Loan by telephone as to whether Kinnaley would be interested in the DBP to pay the deficiency balance by reducing monthly payments from $522.37 to $268.75. (ECF 52 ¶ 14; *see also* ECF 52-2). During that conversation, Kinnaley requested that Jordan be removed from the Auto Loan as co-borrower because the default was not her fault and he felt bad about the vehicle being repossessed. (ECF 52 ¶ 15). The Bank claims that MacPherson advised Kinnaley during the call that the Bank would not release Jordan from the Auto Loan unless Kinnaley found another co-signer or paid the Auto Loan in full by taking out another loan. (*Id.* ¶ 16). Jordan was unaware that the Bank and Kinnaley were engaging in the DBP process. (ECF 64 ¶ 115).

On February 19, 2019, MacPherson sent a letter—memorializing the aforementioned telephone call—addressed to Jordan and Kinnaley at the Payne, Ohio, address, stating in relevant

part:

> RE: Account #: []0001
>
> Dear CLAUDETTE JORDAN:
>
> It was a pleasure speaking with you today regarding your Account. As discussed, we have agreed to reduce your monthly benefit from $522.37 to $268.75 effective with your two (2) required good faith payment(s) and then the agreed upon amount continuing monthly until your account is paid in full (the "Payment Plan"). Please note that interest and late fees, if applicable, continue to accrue on the outstanding balance of your account until satisfied.
>
> Pursuant to our agreement, your two (2) scheduled payment(s) are due by February 20, 2019 and March 19, 2019. The payment(s) must be received by the date(s) indicated; otherwise this agreement becomes null and void. By accepting the modified terms of the Payment Plan and making your two (2) good faith payment(s), you acknowledge that you are liable to M&T Bank for the full amount of $16,630.60 and you expressly waive any counter-claim, defense, offset or claim of any kind or nature with respect to the original Loan documents or the Payment Plan. We have enclosed one (1) payment envelope(s) for your convenience.
>
> Upon receipt of the second payment, you will receive a new account number and monthly statements with the new payment amount. . . . Finally, please sign a copy of this letter acknowledging this agreement and return it as soon as possible to [the Bank].

(ECF 52-2; *see also* ECF 52 ¶ 18).

On February 25, 2019, Kinnaley called the Bank, confirmed the amount of the two good faith payments, and the Bank told him he would receive a new account number in connection with the DBP. (ECF 52 ¶ 21). Kinnaley made the two good-faith payments, which reduced the balance to $15,710, and he referenced both account numbers when doing so. (*Id.* ¶ 22). Kinnaley testified that he believed he was entering a new loan based on the representations made to him at the time, though he was "not sure." (ECF 52-15 at 43-44 ("What was explained to me and how I took it was, they were going to sell the vehicle for what it was worth, which was 14, and then I thought they were going to write up a new loan for 16 grand that I would pay off, but I'm not

8

sure."); *see also* ECF 52 ¶ 17).

### D. The Bank Assigns a New Account Number to the Deficiency Balance

On May 19, 2019, the Bank assigned a new account number, *******2001 ("account no. 2001"), to the deficiency balance in the amount of $15,710. (ECF 52 ¶¶ 22, 23). The Bank closed account no. 0001 and ceased reporting it to the CRAs. (*Id.* ¶ 24). The Bank did not receive or use any of its own funds to pay off the Auto Loan in account no. 0001 when the DBP began in May 2019. (ECF 71 ¶¶ 176, 178; *see also* ECF 64 ¶ 122.10). Nor did the Bank extend credit to Kinnaley to pay off the Auto Loan as part of the DBP. (ECF 71 ¶ 177; *see also* ECF 64 ¶¶ 117, 122.10).[7]

For credit reporting purposes, the Bank identified account no. 0001 in the credit reporting platform as "AS," which means "Account closed due to refinance", and as "63," which means "Account paid in full, was a repossession." (ECF 52 ¶¶ 24, 24.1, 24.2). The Bank states that it coded it this way to avoid reporting two different accounts with open balances on the same loan. (*Id.* ¶ 24).[8] Jordan, however, criticizes this rationale, asserting that credit reporting industry standards do not allow two different accounts to be reported with open balances. (*Id.* § 24.3).

In any event, the Bank reported Jordan as jointly liable for the deficiency balance—that is, account no. 2001—to all three national CRAs. (*Id.* ¶ 24.6).[9] The Bank did not issue a Truth in

---

[7] While Jordan disputes the Bank's statement that it did not receive or use its own funds to pay off the Auto Loan when the DBP began in May 2019 or extend credit to Kinnaley to pay off the Auto Loan as part of the DBP, Jordan does so by advancing legal conclusions from the evidence of record, rather than producing evidence of actual payments or transfer of funds by the Bank. (*See* ECF 52 ¶ 122.10; ECF 71 ¶ 177).

[8] The Bank further states that if the Auto Loan had been paid in full, it would have coded it as a "13", which means the debt was satisfied. (*Id.* ¶ 24.5).

[9] Based on the Bank's reporting, Experian stated that it had no reason to believe that account nos. 0001 and 2001 were linked or related to each other, and that it had no knowledge as to whether the accounts were, in fact, linked or related. (ECF 64 § 135; *see* ECF 52-6 ¶ 11).

9

Lending Disclosure Statement when the DBP began. (ECF 71 ¶ 173). There is only one account history for the Auto Loan as shown in the Bank's "Arch Report" referenced by account no. 0001. (*Id.* ¶ 174; *see* ECF 52-11).

After May 24, 2019, no payments on the deficiency balance in account no. 2001 were made, and the account became delinquent. (ECF 52 ¶ 25).

### E. Account No. 2001 Appears on Jordan's Credit Report

On June 7 or 8, 2019, Kinnaley told Jordan that he had given the vehicle back to the Bank and that she "didn't need to worry" because he got a loan only with his name on it to pay off the amount owed. (ECF 44-1 at 111). However, at some point in June 2019, Jordan checked her credit report online and learned that account no. 2001 was appearing on her credit report. (ECF 52 ¶¶ 26, 27).

On June 10, June 17, and July 1, 2019, Jordan spoke with the Bank complaining that account no. 2001 was appearing on her credit report when she did not agree to it. (*Id.* ¶ 27). The Bank advised her that the account pertained to the Auto Loan she had signed and that they would send her the documents relating to the repossession. (*Id.*). The Bank also told her that the Auto Loan had not been paid off, there was a deficiency balance, and that she was responsible for the deficiency under the Auto Loan agreement. (*Id.*). Jordan asked the Bank for a letter showing that the Auto Loan was discharged. (*Id.* ¶ 28). The Bank refused to provide such a letter given its position that the Auto Loan was not paid in full. (*Id.*).

### F. The Bank Accesses Jordan's Credit Report

On November 27, 2019, the Bank showed a deficiency balance in the amount of $16,630.60 on account no. 2001, and that the account was six months delinquent. (*Id.* ¶¶ 83, 84). The Bank requested Jordan's credit report from Experian for the purpose of determining future

collection activity on the deficiency balance. (*Id.* ¶ 83). On November 30, 2019, the Bank claims

it "charged off" the account and referred it to an outside collection firm. (*Id.* ¶ 86).[10]

### G. From August 2020 to October 2021, the Bank Receives Eight ACDVs From the CRAs Submitted by Jordan About Account No. 2001

From August 2020 through October 2021, the Bank received at least eight automated

consumer dispute verification ("ACDV") forms[11]—that is, "indirect" disputes—from the CRAs

submitted by Jordan regarding account no. 2001. (ECF 52 ¶ 29).[12]

1. <u>The First Dispute</u>

On September 22, 2020, a Bank investigator responded to an ACDV from TransUnion

concerning account no. 2001 regarding a dispute identified as "116, disputes compliance

condition." (*Id.* ¶¶ 30, 31; *see* ECF 44-4). The investigator concluded that the Bank was not

reporting account no. 2001 with a compliance code because none was required, and that the

Bank's information from the Auto Loan and the deficiency balance account matched the ACDV

information. (*Id.* ¶ 34). Specifically, the investigator matched the name, date of birth, social

security number, address against the Bank's records for account nos. 0001 and 2001, confirmed

the account was not in bankruptcy, and that the payment history, open/close dates, and balance

were reported accurately. (*Id.* ¶ 33). The investigator responded that the ACDV was accurate as

to the disputed information. (*Id.* ¶ 34).

---

[10] Jordan, however, disputes this characterization, asserting that account no. 0001 was "paid in full using the proceeds from the [r]efinance"—that is, account no. 2001. (ECF 64 ¶ 149.4).

[11] When a consumer notifies a CRA that information on a credit report is incorrect, the CRA will identify the relevant data furnisher and transmit to it an ACDV form. (ECF 52 ¶ 29).

[12] While the Bank's brief states that the CRAs forwarded nine ACDVs to the Bank to investigate (ECF 43 at 5), the Bank's Statement of Material Facts only describes eight ACDVs (ECF 52 ¶¶ 30-82).

2. <u>The Second Dispute</u>

On October 2, 2020, the Bank received an ACDV from TransUnion with dispute code: "103 Claims true identity fraud, account fraudulently opened, Provide or confirm complete ID." (*Id.* ¶ 38). The investigator matched Jordan's personal identifiers from the CRA's information on the ACDV to the Bank's records for the Auto Loan and account no. 2001. (*Id.* ¶ 40). The Bank's records matched the information on the ACDV other than the telephone number, which the investigator did not consider a "red flag" because changed telephone numbers are not indicators of identity theft. (*Id.*). The investigator also reviewed the payment history, the account history notes, and verified that Jordan had not filed for bankruptcy. (*Id.* ¶ 41). The investigator responded to the ACDV that the dispute information was reported accurately. (*Id.* ¶ 42). Although not related to the dispute information, the investigator also deleted the closed date because the account was "charged off[,]" rather than closed. (*Id*. ¶ 41).

Further, the investigator sent an inquiry, referred to as a "UAR", to the financial crimes department of the Bank to review the claim because it was the first time that Jordan had asserted a fraud and identity theft dispute. (*Id.* ¶ 43). The fraud department then researched the claim. (*Id.* ¶ 44). On November 16, 2020, the fraud department sent a letter to Jordan that the Bank had investigated the dispute and found that account no. 2001 was valid and not the basis of identity theft or fraud. (*Id.*).

3. <u>The Third Dispute</u>

On October 25, 2020, Equifax generated, on its own, an ACDV to the Bank as a result of Jordan's report of identity theft to TransUnion. (*Id*. ¶ 45). The ACDV from Equifax contained the same information that was in TransUnion's ACDV. (*Id*. ¶ 46). The investigator again matched Jordan's personal identifiers from the CRA's information on the ACDV to the Bank's

records for the Auto Loan and account no. 2001. (*Id.* ¶ 49). The Bank's records matched the information on the ACDV other than the telephone number. (*Id.*). The investigator also reviewed the payment history, balance, open/close dates, and the special comments showing that the account was "charged off." (*Id.* ¶ 50). The investigator responded to the ACDV that the dispute information was reported accurately. (*Id.* ¶ 47). The investigator also saw that her colleague had sent a UAR to the financial crimes department on October 22, 2020, so she did not send a second inquiry. (*Id.* ¶ 51).

4. The Fourth Dispute

A Bank investigator responded to an ACDV generated by Equifax dated January 29, 2021, concerning account no. 2001 with the same 103 dispute code. (*Id.* ¶ 54). The investigator reviewed the Auto Loan documents and payment history and confirmed the deficiency balance, date of account delinquency, and the charge-off date and status on account no. 2001. (*Id.* ¶ 56). The investigator did not update the information because it was accurate. (*Id.*). The investigator also noted that her colleague had sent a UAR to the financial crimes department regarding account no. 2001 on January 26, 2021, and confirmed the subject matter of that UAR was the same as the current ACDV. (*Id.* ¶ 57).

5. The Fifth Dispute

On January 12, 2021, the Bank received an ACDV from TransUnion regarding account no. 2001 again with dispute code 103. (*Id.* ¶ 60). The ACDV contained the following statement: "I did not open or authorize this account. I have asked the creditor multiple times for a copy of the contract to file a police report. The creditor to date has never sent me documents related to this." (ECF 44-5 at 154; *see also* ECF 52 ¶ 60). The investigator matched Jordan's personal identifiers on the ACDV to the Bank's records for the Auto Loan and account no. 2001. (ECF 52

¶ 61). The investigator also reviewed the payment history and account history notes and verified that Jordan had not filed for bankruptcy. (*Id.* ¶ 62). The information was accurate so no updates were made. (*Id.*). The investigator responded to the ACDV that the disputed information was reported accurately. (*Id.* ¶ 63). On January 21, 2021, the investigator sent an inquiry to the financial crimes department because the ACDV included a statement from Jordan that she did not authorize or open the account. (*Id.* ¶ 64).

6. <u>The Sixth Dispute</u>

On March 2, 2021, the Bank received an ACDV from Equifax regarding account no. 2001 again with dispute code 103. (*Id.* ¶ 65). The investigator reviewed the account history, payment history, delinquency dates, open/closed dates, loan status, charged-off date, checked for active bankruptcy, and updated information in the payment grid. (*Id.* ¶¶ 66, 67). The investigator also checked the prior disputes and responses to previous inquiries, including the UARs sent to the financial crimes department and that department's communication to Jordan that no identity theft or fraud was found. (*Id.* ¶ 68).

7. <u>The Seventh Dispute</u>

On October 12, 2021, the Bank received an ACDV from TransUnion disputing account no. 2001 with the same 103 dispute code. (*Id.* ¶ 69; *see* ECF 49-4 at 13). This time attached to the ACDV was a Federal Trade Commission Theft Affidavit ("FTC Affidavit") dated October 1, 2021, and a police report dated September 7, 2021, in which Jordan accused Kinnaley of stealing her identity. (ECF 52 ¶¶ 69-70). In the FTC Affidavit, Jordan stated that she had signed for the vehicle loan with the co-borrower Kinnaley, the loan was defaulted, the co-borrower took out a loan with the Bank to repay the deficiency, and that she did not sign the loan for the deficiency balance. (*Id.* ¶ 71; *see* ECF 44-6 at 19).

Again the investigator compared the information on the Auto Loan and account no. 2001, concluding that Jordan's personal identifiers matched the ACDV. (ECF 52 ¶ 74). The investigator also reviewed the Auto Loan documents, payment history, outstanding balance, delinquency dates, open/closed dates, and the charged-off account statutes, confirming that all information was accurate. (*Id.* ¶ 75). The investigator updated the account payment history to show the charge off as of a specific date and searched for previous disputes and the Bank's responses, which revealed that previous inquiries were sent to the financial crimes department. (*Id.* ¶¶ 75, 76). Because the account notes showed the financial crimes department denied Jordan's disputes of identity theft or fraud, the investigator did not submit another formal inquiry to the financial crimes department, though the investigator may have submitted the FTC Affidavit and police report to that department. (*Id*. ¶ 76).

8. The Eighth Dispute

On October 12, 2021, the Bank received an ACDV from Equifax, which contained the same information as the October 12, 2021, ACDV from TransUnion. (*Id.* ¶ 77). The investigator followed the same procedure used to respond to the TransUnion ACDV, matching Jordan's personal identifiers on the ACDV to the Bank's records. (*Id.* ¶¶ 78, 79). Although Jordan disputed the Ohio address being associated with her, the Bank records confirmed that the Bank listed her address in Fort Wayne, Indiana. (*Id*. ¶ 80). The investigator also reviewed the Auto Loan documents, payment history, outstanding balance, delinquency dates, open/closed dates, and the charged-off account statutes, confirming that all information was accurate. (*Id.* ¶ 81). The investigator updated the account payment history to show the charge off as of a specific date. (*Id.*). The investigator also searched for previous disputes and the Bank's responses. (*Id*. ¶ 82). Because the account notes showed the financial crimes department denied Jordan's disputes

15

of identity theft or fraud, the investigator did not submit another formal inquiry to the financial

crimes department, though she may have submitted the FTC Affidavit and police report to that

department. (*Id.* ¶ 82).

### H. Jordan's Claimed Damages

Jordan seeks damages for out-of-pocket expenses, emotional distress, credit denial, and

loss of credit opportunity. (ECF 52 ¶¶ 87-112). She also seeks statutory damages, punitive

damages, and attorney fees. (ECF 48 ¶ 1).

### IV. DISCUSSION

Jordan contends that the Bank violated the FCRA in several ways. First, she argues that

the Bank inaccurately reported the "ownership" of account no. 2001 in violation of 15 U.S.C. §

1681s-2(a) when it reported to the CRAs that she was liable for account no. 2001. (ECF 50 at 16-

17). Jordan also contends that the Bank violated the FCRA by failing to mark account no. 2001

as "disputed" in accordance with § 1681s-2(a)(3). (*Id.* at 17-19). Next, Jordan claims that the

Bank violated § 1681s-2(b) by failing to reasonably investigate the accuracy and completeness

of the disputed information. (*Id.* at 19-24). Finally, Jordan argues that the Bank violated the

FCRA by unlawfully accessing her credit report on November 27, 2019. (ECF 28 ¶ 42-45). Each

party claims they are entitled to summary judgment in their favor on these claims. The Court will

begin by summarizing the relevant provisions of the FCRA.

### A. Summary of the Relevant Provisions of the FCRA

"Congress enacted the FCRA in part to protect consumers by ensuring 'fair and accurate

credit reporting.'" *Lute v. TransUnion, LLC*, No. 18-cv-07451, 2022 WL 971877, at *2 (N.D. Ill.

Mar. 31, 2022) (quoting 15 U.S.C. § 1681(a)(1)). "Section 1681s-2 sets out the duties imposed

on a 'furnisher of information,' which is an entity that 'transmits information about a particular

debt owed by a particular consumer to a [CRA].'" *Id.* (quoting 15 U.S.C. § 1681s-2; *Wade v. Equifax, Inc.*, No. 02 C 3205, 2003 WL 22089694, at *2 (N.D. Ill. Sept. 8, 2003)). "The FCRA requires furnishers to provide accurate information to consumer [CRAs]." *Wade*, 2003 WL 22089694, at *2 (citing 15 U.S.C. § 1681s-2(a)). "[A]n entity cannot furnish information if it knows or has reasonable cause to know the information is inaccurate." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 433-34 (7th Cir. 2009) (citing 15 U.S.C. § 1681s-2(a)(1)(A)).

While § 1681s-2(a) prohibits a furnisher from providing inaccurate information to CRAs, it does not provide a federal private right of action to consumers. *See Abbett v. Bank of Am.*, No. 3:04CV 01102 WKW VPM, 2006 WL 581193, at *3 n.5 (M.D. Ala. Mar. 8, 2006) ("Courts have routinely held that § 1681s-2(a) may be enforced by the government as provided in the statute even though it creates an affirmative obligation to refrain from reporting inaccurate information." (citation omitted)); *see also Lang v. TCF Nat'l Bank*, 338 F. App'x 541, 544 (7th Cir. 2009) ("Section 1681s-2(c) specifically exempts violations of § 1681s-2(a) from private civil liability; only the Federal Trade Commission can initiate a suit under that section." (citations omitted)); *Rollins v. Peoples Gas Light & Coke Co.*, 379 F. Supp. 2d 964, 967 (N.D. Ill. 2005) ("It is undisputed that there is no private right of action under § 1681s-2(a)." (citations omitted)). Accordingly, Jordan advances an inaccuracy argument not as a stand-alone claim, but as an element of a claim under § 1681s-2(b), which describes the "[d]uties of furnishers of information upon notice of dispute." 15 U.S.C. § 1681s-2(b).

Section 1681s-2(b) states that once a furnisher receives notice from a CRA that a consumer has disputed the information provided, the furnisher is required to:

> (a) conduct an investigation with respect to the disputed information; (b) review all relevant information provided by the [CRA] . . . ; (c) report the results of the investigation to the [CRA]; and (d) if the investigation reveals that the

> information is incomplete or inaccurate, report the results to all other [CRAs] to
> which the person furnished the information and that compile and maintain files on
> a consumers on a nationwide basis.

15 U.S.C. § 1681s-2(b); *see also Wade*, 2003 WL 22089694, at *2 (citations omitted). Further,

"[i]f the investigation concludes that a disputed item is inaccurate or cannot be verified, the

furnisher must promptly modify, delete, or block the reporting of that information." *Hukic*, 588

F.3d at 434 (citing 15 U.S.C. § 1681s-2(b)(1)(E)); *see also York v. Equifax Info. Servs., LLC*, No.

19 C 2503, 2020 WL 13542601, at *2 (N.D. Ill. Feb. 10, 2020). "If the furnisher of information

fails to abide by the terms of section 1681s-2(b), the consumer has a private right of action to

enforce its terms." *Varnoado v. Trans Union, LLC*, No. 03 C 6937, 2004 WL 1093488, at *2

(N.D. Ill. Apr. 29, 2004) (citation omitted); *see also York*, 2020 WL 13542601, at *2.

"The federal circuit courts that have interpreted § 1681s 2(b) agree on two threshold

requirements for a claim under the statute[.]" *Frazier v. Dovenmuehle Mortg., Inc.*, 72 F.4th 769,

775 (7th Cir. 2023). These requirements are:

> 1. The plaintiff must make a prima facie showing that the data furnisher provided
> incomplete or inaccurate information.
>
> 2. The plaintiff must also show that the incompleteness or inaccuracy was the
> product of an unreasonable investigation—that is, had the furnisher conducted a
> reasonable investigation, it would have discovered that the data it provided was
> incomplete or inaccurate.

*Id.* (footnotes omitted) (collecting cases). The Seventh Circuit Court of Appeals has "agree[d]

with their interpretations and adopt[ed] these requirements." *Id.*; *see also Simonson v. IQ Data*

*Int'l, Inc.*, 698 F. Supp. 3d 1055, 1064 (W.D. Wis. 2023).

### B. The Accuracy of the Bank's Reporting of Account No. 2001

Turning to Jordan's first argument, Jordan claims that the Bank inaccurately reported

account no. 2001 to the CRAs in violation of § 1681s-2(a). (*See* ECF 50 at 15). This argument is

based on Jordan's position that the Auto Loan and account no. 2001 "represent two distinct loans, one for which [she] is liable and one for which [she] is not liable." (*Id.* at 2). The Bank, however, asserts that its reporting of account no. 2001 was not inaccurate because account no. 2001 was not a new loan but rather "a change to the original [Auto] [L]oan" for which Jordan remained fully liable. (ECF 43 at 8). Both parties seek summary judgment in their favor on Jordan's claim of inaccuracy, arguing that no reasonable jury could conclude in the other's favor on the evidence of record.

### 1. Applicable Law

"[I]ncompleteness or inaccuracy under § 1681s-2(b) requires a showing that the information the data furnisher provided was (1) patently incorrect, or (2) materially misleading, including by omission." *Frazier*, 72 F.4th at 775 (footnote omitted) (collecting cases). "By materially misleading, we mean 'misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.'" *Id.* (citations omitted); *see also Chaitoff v. Experian Info. Sols., Inc.*, 79 F.4th 800, 812 (7th Cir. 2023); *York*, 2020 WL 1354260, at *2 (collecting cases).

### 2. Analysis

Jordan argues that a furnisher reports inaccurate information when it "incorrectly attributes the 'ownership' of an account to a consumer who is not contractually liable for the account" (ECF 50 at 16 (collecting cases)), or where the consumer may have been the victim of identity theft (*id.* (citing *Cushman v. Trans Union Corp.*, 115 F.3d 220, 224-25 (3d Cir. 1997)). She contends that because Kinnaley and the Bank entered into the DBP—which she characterizes as a "refinance"—without her knowledge or authorization, she is not liable for account no. 2001, and thus, the Bank reported inaccurate information to the CRAs. (*Id.*).

In support, Jordan emphasizes that the DBP established a new repayment schedule distinct from the Auto Loan (ECF 52 ¶ 12.3), that the DBP involved generating new account information and reporting the arrangement different to the CRAs (*id.* ¶ 12.4), and that the DBP written policy uses terms such as "rewrite" and "new loan" (*id.* ¶ 12.6; *see also* ECF 49-1), all which she contends "transcends mere modification of the Auto Loan and constitutes a refinancing arrangement and bound only those who expressly agreed to its terms" (*id.* ¶ 12.5). As such, Jordan argues that the Bank "fraudulently reported that [she] was liable for [account no. 2001] to all [CRAs]" and then "failed to reasonably investigate and correct its inaccurate and misleading reporting of [account no. 2001] to which [she] was never a party." (ECF 50 at 2). Jordan urges that "the evidence on this core dispute is so one-sided that no reasonable jury could conclude [otherwise.]" (*Id.*).

The Bank views the facts through a different lens. It states that account no. 2001 "was not a new loan; it was a change to the original [Auto] [L]oan[,]" and therefore that its reporting of account no. 2001 was not inaccurate. (ECF 43 at 8). It explains that when the sale or repossession of a vehicle results in a deficiency balance that a customer wishes to pay over time, the collections software system it uses to manage and process loans automatically assigns a new account number. (ECF 43 at 6-7; *see also* ECF 44-2 at 1-2; ECF 52 ¶ 24).[13] This is because the payment terms have changed, and the loan is now unsecured. (ECF 43 at 6-7; *see also* ECF 44-2 at 4). The Bank states that "[i]f a new account number is not assigned to the deficiency balance, the reduced payment would be reflected as a partial payment under the original loan and therefore reported as delinquent." (ECF 43 at 7; *see also* ECF 52 ¶¶ 23, 24).

---

[13] The Bank states that its collections department uses a software program licensed from Shaw Systems Associates, LLC, to service the loans. (ECF 43 at 6; *see also* ECF 44-2 at 1-2).

To that end, the Bank argues that courts have held that a lender may assign a new account number without a customer's approval, and that a new account number "does not create a new loan—it is the same [Auto] Loan with a different account number." (ECF 43 at 7 (quoting *In re Henriquez*, 536 B.R. 341, 349 (Bankr. N.D. Ga. 2015))). The Bank cites cases in which lenders assigned new account numbers after finding fraudulent activity, an account is charged off, an account is transferred internally, a loan is service transferred, or even due to an unexplained renumbering by the lender of a customer's account. (*Id.* at 7-8 (citing *Bank of Am., N.A. v. Phillips*, No. A152201, 2019 WL 7906185, at *6 (Cal. Ct. App. ); *Ray v. Equifax Info. Servs., LLC*, No. 1:04-cv-0482-JOF, 2008 WL 11322890, at *1 (N.D. Ga.); *Bray v. Santander Bank, N.A.*, No. 3:19-cv-1759(KAD), 2021 WL 2349375, at *1 (D. Conn.); *In re Henriquez,* 536 B.R. at 349; *Crisher v. U.S. Bank Nat'l Ass'n*, N. 2:23-cv-02963-SB-PVC, 2023 WL 9223221, at *1 (C.D. Cal.); *Matter of Hughes*, No. 17-52260-LRC, 2018 WL 1801226, at *10 (Bankr. N.D. Ga.)).

In doing so, the Bank emphasizes that it has offered a legitimate business purpose for assigning a new account number to the remaining deficiency on the Auto Loan following the repossession of the vehicle. *See Jordan v. Equifax Info. Servs., LLC*, 410 F. Supp. 2d 1349, 1355 (N.D. Ga. 2006) ("[T]he evidence is clear that the assignment of the new account number was done for a legitimate business purpose, not to interfere with Plaintiff's rights."). That is, under the collections software program used by the Bank, assigning a new account number to the Auto Loan deficiency allowed the account to be reported as current to the CRAs so long as the borrowers made the reduced payments in accordance with the DBP. (ECF 43 at 7).

Jordan, however, points to evidence showing that the Bank never actually changed the Auto Loan account number from 0001 to 2001, which she contends is a "smoking gun" in this

21

case. (ECF 50 at 9 (emphasis omitted); *see also id.* at 10-11). She observes there is only one Arch Report, which has account no. 0001 on it, indicating that the Bank failed to change the Auto Loan's account number, and that both account nos. 0001 and 2001 continued to exist. (*Id.* at 9-11). Jordan's argument is this:

> The Bank **did not** change the Auto Loan account number. Nor was the Auto Loan balance transferred to account no. *****2001. What happened is that the Bank ***chose***, without Plaintiff's knowledge, consent, or authorization, to refinance the Auto Loan with Kinnaley alone, utilizing the 'stand-alone' provisions of the DBP Policy and, thereby, creating a new refinance loan *with its new account number*, the Refinance, for which only Kinnaley was liable. To be clear, this was the Bank's choice, and it made it. The Bank then used the proceeds from the Refinance, as specifically noted in the Auto Loan Arch Report, to pay off and close the Auto Loan. The Bank's ***choice*** ended Plaintiff's liability for the deficiency and placed the sole responsibility for the repayment of the deficiency on Kinnaley under the terms of the Refinance.

(*Id.* at 11-12 (internal citations omitted)). As such, Jordan urges that a reasonable jury could only conclude that the Bank's reporting of her liability on account no. 2001 was factually incorrect and created a misleading impression that adversely affected her. *See York*, 2020 WL 13542601, at *2.

The Bank seems a bit perplexed by Jordan's assertion of inaccuracy. It emphasizes that if a new account number had not been assigned, then "the reduced payment would appear as a partial payment under the original [Auto] [L]oan and therefore reported as delinquent." (ECF 43 at 7; *see* ECF 52 ¶ 23).[14] In that vein, the Bank emphasizes that Kinnaley did not submit a loan application for account no. 2001, the Bank did not engage in underwriting for account no. 2001

---

[14] Jordan does not suggest that the Bank improperly used, or relied upon, the collections software program licensed from Shaw Systems Associates, LLC. *See generally In re Highsmith*, 542 B.R. 738, 753 (M.D.N.C. Dec. 31, 2015) ("It is the responsibility of the user of any computer program to ensure it is functioning properly." (citations omitted)); *McCormack v. Fed. Home Loan Mortg. Corp.*, 203 B.R. 521, 524 (Bankr. D.N.H. 1996) (stating that creditors "have a clear obligation to adjust their programming and procedures and their instructions to employees to handle complex matters correctly").

or have to verify Kinnaley's income or employment status, and Kinnaley did not sign a new loan agreement or note—all tasks associated with the Bank issuing a new loan. (ECF 43 at 7; *see* ECF 52 ¶ 13). The Bank further emphasizes the DBP did not satisfy the Auto Loan, as no proceeds or funds paid off the Auto Loan. (ECF 62 at 4-5; *see* ECF 71 ¶¶ 176, 178; *see also* ECF 64 ¶ 122.10). Rather, the last two payments made on the Auto Loan were the two payments Kinnaley made in accordance with the DBP in April and May 2019. (ECF 52 ¶¶ 13, 22, 25, 84-86; ECF 71 ¶¶ 176-181). Nor did the Bank extend credit to Kinnaley to pay off the Auto Loan as part of the DBP. (ECF 71 ¶ 177; *see also* ECF 64 ¶¶ 117, 122.10).

Indeed, the evidence of record overwhelmingly supports the conclusion that account no. 2001 is merely an extension or modification of account no. 0001, rather than a refinance or new loan. In fact, Jordan's purported "smoking gun" evidence, the single Arch Report with account no. 0001 (ECF 50 at 9 (emphasis omitted); *see* ECF 52-11), is actually consistent with the conclusion that just one loan exists—the Auto Loan on the vehicle. Further, the DBP letter identified the Auto Loan by account no. 0001 and called for reduced payments "until your account is paid in full" and "the outstanding balance of your account [is] satisfied." (ECF 52-2). As the Bank emphasizes, there was no new loan application or underwriting for account no. 2001, no verification of Kinnaley's income or employment status, and Kinnaley did not sign a new loan agreement or note—all tasks associated with the Bank issuing a new loan. (ECF 43 at 7; *see* ECF 52 ¶ 13). Nor was a disclosure statement issued for a new loan as would be required by the Truth in Lending Act. (ECF 71 ¶ 173); *see* 15 U.S.C. § 1632; 12 C.F.R. § 1026.5); *see also Griffin v. U.S. Bank Nat'l Assoc.*, No. 15 C 6871, 2018 WL 1621024, at *3 (N.D. Ill. Apr. 4, 2018) ("Disclosures are required when a loan is refinanced." (citing 12 C.F.R. § 226.20(a)).

To elaborate, "[c]hanges in the terms of an existing loan obligation, such as the deferral

of individual installments, will not constitute a refinancing unless accomplished by the

cancellation of that obligation and the substitution of a new obligation." *Rodriguez v. Chase

Home Fin., LLC*, No. 10 C 05876, 2011 WL 4435633, at *3 (N.D. Ill. Sept. 23, 2011) (brackets

omitted) (quoting *Jackson v. Am. Loan Co.*, 202 F.3d 911, 912 (7th Cir. 2000)); *see also Griffin*,

2018 WL 1621024, at *4. Here, the only evidence that Jordan cites in support of the cancellation

of the Auto Loan is the Bank's coding of account no. 0001 for credit reporting purposes as "AS"

indicating "Account closed due to refinance," and "63", representing "paid in full". (ECF 52 ¶

24, 24.1, 24.2). However, this evidence, standing alone, is insufficient to show that the Bank

actually released Jordan from the Auto Loan obligation. The Bank explains that these codes are

merely the descriptors it used in credit reporting to allow the account to be reported as current,

provided the borrowers made the reduced payments on DBP. (ECF 43 at 4, 7).

Indeed, "[r]enewals and extensions [of loans] . . . . simply allow a borrower more time to

comply with its performance obligations." *In re Carraman*, No. 22-51009-MMP, 2024 WL

2704203, at *4 (W.D. Tex. May 24, 2024). "[They] do not typically involve the advancement of

additional funds to the borrower." *Id.* (citation omitted). "In a renewal and extension, a lender

grants a borrower more time to perform its obligations under a loan . . . . The original loan

'survives' the renewal and extension (rather than being satisfied and replaced by a new loan)."

*Id.* (citation omitted). In fact, The Truth in Lending Act provides that certain instances shall *not*

be treated as a refinancing, including:

> [a] change in the payment schedule or a change in collateral requirements as a
> result of the consumer's default or delinquency, unless the rate is increased, or the
> new amount financed exceeds the unpaid balance plus earned finance charge and
> premiums for continuance of insurance of the types described in § 226.4(d).

*Griffin*, 2018 WL 1621024, at *3 (citation and emphasis omitted). "Appl[y]ing this rule, courts

have found that a loan modification does not constitute a refinancing since it does not cancel the existing obligation." *Id.* at 4 (citations omitted); *see also McMillan v. BMO Harris Bank N.A.*, No. 18 C 6386, 2019 WL 13470229, at *3 (N.D. Ill. Apr. 17, 2019) ("[T]he forbearance agreement neither canceled the [home equity line of credit] nor modif[ied] it; instead, it deferred repayment for six months, and therefore the Bank did not refinance the loan."); *Rodriguez*, 2011 WL 4435633, at *3 (explaining the distinction that a loan modification in which the lender agrees to defer repayment until another payday was not a refinancing "because there was no cancellation of the initial loan, nor a substitution of a new one" (citing *Jackson*, 202 F.3d at 913)).

Here, the record compels one conclusion—that account no. 2001 is akin to an extension or modification of the Auto Loan, *not* a refinancing or new loan. As such, Jordan remained on the hook for the $16,630 deficiency originating in account no. 0001 and subsequently represented by account no. 2001. (*See* ECF 52 ¶ 19). Given Jordan's ongoing liability on the Auto Loan, the Bank's reporting of her liability on account no. 2001 to the CRAs was neither "factually incorrect," nor did it create a "misleading impression" that adversely affected Jordan. *York*, 2020 WL 13542601, at *2 (citations omitted). Rather, the Bank's reporting accurately reflected that Jordan was indeed jointly liable for a debt of $16,630, which was in default.

To the extent Jordan complains she was not given notice of Kinnaley's agreement to the DBP with the Bank, well that is what Jordan signed up for. The plain language of the Auto Loan gave the Bank the right to extend the Auto Loan's terms *without notice to Jordan or Kinnaley*. (ECF 44-2 at 8; *see also* ECF 52 ¶ 5). The Auto Loan also gave the Bank the power to "exercise any right against any person or property without losing any right against [Jordan] . . . ." (ECF 44-2 at 8). Jordan fails to point to any evidence that required the Bank to contact her about the DBP

or Kinnaley's failure to make payments.

In sum, the evidence of record can only lead to one reasonable conclusion: that account no. 2001 constituted the remaining deficiency on the Auto Loan after repossession of the vehicle and that, as such, Jordan was liable for account no. 2001. The Bank's reporting of account no. 2001 to the CRAs was neither factually inaccurate, nor did it create a misleading impression that adversely affected Jordan. *See York*, 2020 WL 13542601, at *2.

### B. The Bank's Failure to Report That Account No. 2001 Was "Disputed"

Jordan also asserts that once the Bank received her disputes to account no. 2001, the Bank violated the FCRA by failing to mark account no. 2001 as "disputed" in accordance with § 1681s-2(a)(3). (ECF 50 at 17). Specifically, Jordan claims that the Bank should have: (1) promptly marked Jordan's tradeline as "disputed by consumer" when furnishing account no. 2001 to the CRAs; and (2) "used all available information to investigate the accuracy of the information it was providing about [Jordan] to the CRAs." (*Id.* at 18). The Bank, on the other hand, contends that Jordan's dispute about account no. 2001 was meritless given that she was liable for the unpaid Auto Loan deficiency, and thus, the Bank had no obligation to mark account no. 2001 as disputed. (ECF 43 at 11).

### 1. Applicable Law

"The duty of furnishers to provide notice of a dispute appears in § 1681s-2(a)(3)" of the FCRA. *Lute*, 2022 WL 971877, at *4. "Though the Seventh Circuit has not addressed the issue, other circuits have held that after receiving notice of a dispute, a furnisher's decision to continue reporting a disputed debt without any notation of the dispute presents a cognizable claim under §

1681s-2(b)." *Id.* (citation omitted).[15]

Having said that, those courts have further explained that "a furnisher does not report 'incomplete or inaccurate' information within the meaning of § 1681s-2(b) simply by failing to report a meritless dispute, because reporting an actual debt without noting that it is disputed is unlikely to be materially misleading." *Id.* (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009)). "Rather, it is the failure to report a bona fide dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s-2(b)." *Id.* (citations, brackets, and internal quotation marks omitted).

As one district court explained:

> [I]t may seem peculiar that FCRA compels a furnisher, who can only be formally notified of a dispute by a CRA, to then re-designate the account as disputed in its submission back to the same CRA, which of course already knows about the dispute, having been the initial recipient of notice from the consumer. But . . . this requirement serves two purposes: first, the furnisher, not the CRA, is in the best position to determine whether the dispute is bona fide, and thus the furnisher's validation of the dispute signifies that the dispute is genuine; and second, the furnisher must provide notice of the dispute to all CRAs to whom it originally submitted the information—not just the CRA which initially notified the furnisher of the dispute.

*Harb v. Westlake Servs. LLC*, 748 F. Supp. 3d 1170, 1187 (M.D. Fla. 2024) (citation and internal quotation marks omitted).

"The ultimate question is whether failing to report the dispute is misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Scheel-Baggs v. Bank of Am.*, 575 F. Supp. 2d 1031, 1039 (W.D. Wis. Sept. 15, 2008) (citation, brackets, and internal quotation marks omitted). Therefore, "a furnisher's failure to report a dispute *may*

---

[15] As explained earlier, a consumer cannot bring an action under § 1681s-2(a). *See Perry v. First Nat'l Bank*, 459 F.3d 816, 822 (7th Cir. 2006); *see also Lute*, 2022 WL 971877, at *4. "Instead, consumers must bring any action against a furnisher for failure to follow reasonable procedures under § 1681s-2(b)." *Lute*, 2022 WL 971877, at *4.

constitute a material inaccuracy on a plaintiff's credit report[,]" but there is no "automatic liability under § 1681s-2(b)" for failure to flag an account as disputed. *Lute*, 2022 WL 971877, at *5 (citations omitted).

Under § 1681s-2(b)(2)(E), "when an item of information is disputed by a consumer, the furnisher of information must modify, delete or block the disputed information if it is found to be inaccurate or incomplete or cannot be verified after any reinvestigation." *Scheel-Baggs v. Bank of Am.*, 575 F. Supp. 2d 1031, 1039 (W.D. Wis. Sept. 15, 2008) (internal quotation marks omitted) (citing 15 § 1681s-2(b)(1)(E)). "In other words, once a disputed piece of information has been verified by an investigation, § 1681s-2(b) imposes no further obligation" on the furnisher. *Id.*

2. <u>Analysis</u>

Jordan argues that upon receiving her direct disputes, the Bank should have marked account no. 2001 as "disputed" in its ADCV form returned to the CRAs. (ECF 50 at 18). Specifically, Jordan contends that the Bank should have placed an "XB" code on each ADCV form returned to the CRA, which means "disputed by consumer; furnisher is conducting investigation." (*Id.*).[16]

However, "[t]he FCRA does not require the use of—or even mention—these codes." *Sherman v. Sheffield Fin., LLC*, 627 F. Supp. 3d 1000, 1016 n.15 (D. Minn. 2022); *see also Ross v. Tower Loan of Missouri, LLC*, No. 21-00299-CV-W-GAF, 2022 WL 22884658, at *6 (W.D. Mo. Nov. 4, 2022). Rather, the question is whether the furnisher acknowledged the existence of

---

[16] Jordan's direct disputes to the Bank are not at issue in this case, as "there is no private right of action" arising from direct disputes. *See Prosser v. Cap. One Bank (USA) N.A.*, No. 1:20-cv-01117-TWP-TAB, 2021 WL 6050015, at *9 (S.D. Ind. 2021) (citations omitted).

the consumer's dispute, "through these codes or in other ways." *Sherman*, 627 F. Supp. 3d at 1016 n.15. In any event, "the Compliance Codes expressly state that 'XB' should no longer be reported after the investigation is complete . . . ." *Foster v. AFNI, Inc*., No. 2:18-CV-12340-TGB, 2020 WL 1531651, at *7 (E.D. Mich. Mar. 31, 2020) (citation and internal quotation marks omitted).

Here, Jordan's argument seems to rest on an automatic liability interpretation of § 1681s-2(b). (ECF 50 at 18). That is, Jordan contends that summary judgment should be entered in her favor simply because the Bank did not mark account no. 2001 as "disputed." (*Id.* (citing ECF 52-10 (the expert witness report of Evan Hendricks))). But in doing so, Jordan ignores that "[i]t is the failure to report a bona fide dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s-2(b)." *Levine v. JP Morgan Chase & Co.*, 46 F. Supp. 3d 871, 876 (E.D. Wis. 2014) (citation omitted). To reiterate, a furnisher does not violate § 1681s-2(b) "simply by failing to report a meritless dispute . . . ." *Id.* at 875-76.

The Bank asserts that all of Jordan's disputes of account no. 2001 were meritless because, as concluded earlier, account no. 2001 was merely the deficiency balance of the Auto Loan for which Jordan remained legally responsible. (*See* ECF 43 at 11; *see also* ECF 62 at 11). The Bank reiterates that "had [it] not designated the [Auto Loan] deficiency balance with a new account number, [account no. 2001], it would have reported the deficiency balance under the original account number[, account no. 0001]." (ECF 43 at 11; *see* ECF 52 ¶ 23). Accordingly, the Bank argues that there was "no valid dispute for [the Bank] to report[,]" and its failure to mark account no. 2001 as 'disputed' "could therefore not have been materially misleading." (ECF 43 at 11 ("[The Bank's] redesignation of the account with a new account number did not

change the fact of the default and [Jordan's] liability for the unpaid balance. It thus could not and would not have any effect on credit decisions.")).

Consistent with the Court's reasoning *supra* with respect to Jordan's inaccuracy argument, the Court agrees that Jordan's disputes were meritless, and thus, that there was no bona fide dispute for the Bank to report. The Bank investigated the disputes and each time concluded that Jordan was responsible for the deficiency balance of the Auto Loan subsequently represented by account no. 2001. (*See* ECF 52 ¶¶ 30-82).[17] As a result, no reasonable jury could conclude on this record that the Bank's failure to mark account no. 2001 as "disputed" could have been materially misleading, as there is no evidence that the Bank ever released Jordan from the Auto Loan obligations. Rather, Jordan remains liable for the $16,630 deficiency originated in account no. 0001 and later represented by account no. 2001.

### C. Whether the Bank's Investigations of the Disputes Were Reasonable

Regardless of Jordan's ability to establish incompleteness or inaccuracy, to succeed on a § 1681s-(2)(b) claim, Jordan must also show that the purported incompleteness or inaccuracy "was the product of an unreasonable investigation—that is, had the furnisher conducted a reasonable investigation, it would have discovered that the data it provided was incomplete or inaccurate." *Frazier*, 72 F.4th at 775 (footnote omitted) (collecting cases).[18] Jordan and the Bank each seek summary judgment in their favor as to whether the Bank completed a reasonable investigation into the disputes. (ECF 43 at 10-17; ECF 50 at 19).

---

[17] The code "XB" should not be used after an investigation is complete. *See Foster*, 2020 WL 1531651, at *7; *see also Farrington v. Freedom Mortg. Corp.*, No. 20-4432 (KMW-AMD), 2022 WL 16552779, at *12 n.14 (D.N.J. Oct. 31, 2022) ("[T]he XB code would have been irrelevant to [the furnisher's] report back to the CRA because the investigation was complete.").

[18] "Section 1681s-2(b) applies when the furnisher receives notice of a dispute *from a credit agency*, not from the consumer herself." *Simonson*, 698 F. Supp. 3d at 1064 (emphasis added).

1. Applicable Law

"What constitutes a reasonable investigation depends on the scope of the notice received by the furnisher from the [CRA]." *Mirabile v. Bank of Am., Nat'l Assoc.*, No. 23 CV 1719, 2024 WL 1250265, at *6 (N.D. Ill. Mar. 22, 2024) (citing *Woods v. LVNV Funding, LLC*, 27 F.4th 544, 550 (7th Cir. 2022)). That is, "[r]easonableness is determined based on the totality of the circumstances." *Simonson*, 698 F. Supp. 3d at 1064 (citation omitted); *see also Woods*, 27 F.4th at 550 ("That investigation . . . must be 'reasonable'—pro forma inquiries will not do." (citing *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005)). "The reasonableness of the investigation is to be determined by an objective standard, and the burden of showing the investigation was unreasonable is on the plaintiff." *Maiteki v. Marten Transp. Ltd.*, 828 F.3d 1272, 1275 (10th Cir. 2016) (citation, brackets, and internal quotation marks omitted); *see also Chiang v. Verizon New England Inc.*, 595 F.3d 26, 38 (1st Cir. 2010). "The reasonableness of an investigation is typically a factual question reserved for a jury unless the reasonableness of a furnisher's procedures is 'beyond question.'" *Mirabile*, 2024 WL 1250265, at *5 (citation omitted); *see also Westra*, 409 F.3d at 827) ("Whether a defendant's investigation is reasonable is a factual question normally reserved for trial; however, summary judgment is proper if the reasonableness of the defendant's procedures is beyond question." (citation omitted)); *Lute*, 2022 WL 971877, at *5.

2. Analysis

Jordan contends that the Bank failed to reasonably investigate all eight disputes, or ACDVs, pertaining to account no. 2001 that the CRAs communicated to the Bank. (ECF 50 at 21-22). She asserts that the Bank performed perfunctory "[d]ata [c]onformity" investigations in response to her fraud and identity theft claims in that they "merely confirmed that the

information maintained by the CRAs accurately reflected the Bank's information that generated the CRAs' information in the first place . . . ." (*Id.*). She argues that the Bank should have "check[ed] the records in its possession," listened to the recorded calls of her direct disputes, and examined the terms of the DBP, all which "would have revealed the Bank knew [she] never provided the required authorization to be bound by [account no. 2001]." (*Id.* at 22 (citation omitted)).

The reasonableness of the Bank's investigation must be assessed objectively based on the content of the ACDVs that the Bank received. *Frazier*, 72 F.4th at 776-77. That is, "[b]ecause a furnisher's duty to investigate pursuant to [§ 1681s-2(b)] arises only upon receipt of a notice of dispute from a CRA, the furnisher need only investigate what it learned about the nature of the dispute from the description in the CRA's notice of dispute." *Ross*, 2022 WL 22884658, at *5 (citation and internal quotation marks omitted).

The first ACDV the Bank received was coded as "116, disputes compliance condition." (ECF 52 ¶ 31). The Bank's investigator matched the name, date of birth, social security number, and address that the CRA provided against the Bank's record for the Auto Loan, that is, account no. 0001, and account no. 2001, saw that the two accounts were linked due to a deficiency balance after a vehicle repossession, and determined that no compliance codes were required with installment loans, such as the Auto Loan. (ECF 52 ¶¶ 32-34).

The other seven ACDVs were coded "103" and reflected the disputes as "Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID." (*See, e.g.*, ECF 52 ¶¶ 38, 46, 54, 60, 65, 69, 77). The record reflects that the Bank investigated each of these disputes and confirmed that account no. 2001 merely reflected the DBP on the Auto Loan, that Jordan was fully responsible for the Auto Loan, and that there were no "red flags" of identify

theft. (*See, e.g.*, ECF 52 ¶ 40). The Bank not only verified Jordan's various personal identifiers, but also reviewed the Auto Loan agreement that Jordan had signed, the prior disputes made by Jordan, and the fraud department's investigation confirming that Jordan's claims of identity theft were not valid. (ECF 52 ¶¶ 35-82). The Bank also verified that Jordan had not filed for bankruptcy and reviewed a police report in which Jordan accused Kinnaley of stealing her identity. (ECF 52 ¶¶ 62, 72).

Ultimately, all of Jordan's arguments about the Bank's investigation of her disputes boil down to nothing more than one mantra—that the Bank's investigations were unreasonable because they concluded she was responsible for account no. 2001. However, just because the Bank's investigations reached a conclusion that Jordan disagrees with does not mean that the Bank failed to reasonably investigate her disputes. *See Chiang*, 595 F.3d at 41 ("Chiang has not . . . demonstrated that any of his substantive disputes with Verizon NE involved actual, factual inaccuracies in his billing that a reasonable investigation could have detected. To the extent that his argument reduces to the claim that any investigation that did not accept his allegations as accurate was by definition unreasonable, it fails."). No matter what the Bank could have done differently in its investigations, it would still arrive at the same conclusion—that there was no fraud or identity theft and Jordan was responsible for the Auto Loan debt in account no. 2001. *See Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018) ("[A] plaintiff asserting a claim against a furnisher for failure to conduct a reasonable investigation cannot prevail on the claim without demonstrating that *had* the furnisher conducted a reasonable investigation, the result would have been different; *i.e.*, that the furnisher would have discovered that the information it reported was inaccurate or incomplete, triggering the furnisher's obligation to correct the information. Absent that showing, a plaintiff's claim against a furnisher

necessarily fails, as the plaintiff would be unable to demonstrate any injury from the allegedly deficient investigation.").

Having examined the totality of the circumstances, the reasonableness of the Bank's investigative procedures "is beyond question" here, *Westra*, 409 F.3d at 827, and summary judgment will be entered in the Bank's favor on this claim.

### D. The Bank's Request for Jordan's Credit Report in November 2019

Jordan also claims that the Bank violated the FCRA by unlawfully accessing her credit report on November 27, 2019. (*See* ECF 28 ¶¶ 42-45). The Bank moves for summary judgment on this claim as well, stating that its request for Jordan's credit report was for a permissible purpose in accordance with the FCRA. (*See* ECF 43 at 25).

Under the FCRA, "a [CRA] must have a permissible purpose when it furnishes a consumer report." *Santangelo v. Comcast Corp.*, No. 15-cv-0293, 2015 WL 3421156, at *3 (N.D. Ill. May 28, 2015) (citation and brackets omitted). Section 1681b describes the "[p]ermissible purposes" for which a CRA may furnish a consumer report, including to review an account for collection of a debt, 15 U.S.C. § 1681b(a)(3)(A), or for "a legitimate business need[,]" such as to determine whether a consumer is meeting the terms of an account, *id.* § 1681(a)(3)(F)(ii).

On November 27, 2019, after no payments were made on the balance of the Auto Loan for more than six months, the Bank requested Jordan's credit report from Experian. (ECF 52 ¶ 83). Three days later, on November 30, 2019, the Bank charged off the account and sent it to collections. (*Id.* ¶ 86). As such, the undisputed facts establish that the Bank's request for Jordan's credit report was for a "permissible purpose" identified in § 1681b—that is, for the review or collection of an account of the consumer or to determine whether the consumer

continues to meet the terms of the account. 15 U.S.C. § 1681b(a)(3)(A), (F)(ii). Consequently, no reasonable jury could conclude that the Bank violated the FCRA in requesting Jordan's credit report on November 27, 2019.

In any event, Jordan failed to address this argument in her response brief to the Bank's motion for summary judgment or in her memorandum in support of her cross-motion for summary judgment. "When a party fails to respond to an issue raised in a summary judgment motion or fails to raise the claim in the response brief, the issue or claim is deemed waived." *Porter v. Franciscan All., Inc.*, No. 1:22-cv-02131-TWP-MJD, 2024 WL 4198144, at *14 (S.D. Ind. Sept. 16, 2024) (citation omitted). Therefore, Jordan apparently has abandoned her claim that the Bank unlawfully accessed her credit report, and summary judgment will be granted in the Bank's favor on this claim as well.[19]

## V. CONCLUSION

For the foregoing reasons, the Bank's motion for summary judgment (ECF 42) is GRANTED, and Jordan's cross-motion for summary judgment (ECF 48) is DENIED. The Clerk is DIRECTED to enter judgment in favor of the Bank and against Jordan.

SO ORDERED.

Entered this 21st day of March 2025.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[19] Because the Court concludes that the Bank is entitled to judgment as a matter of law in its favor on all of Jordan's claims for the reasons discussed herein, it need not reach the Bank's additional argument that Jordan cannot show she suffered any damage cognizable under the FCRA. (ECF 43 at 17-23).